**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

United States of America,        Criminal No. 14-373 MJD/JJK

          Plaintiff,

v.        **REPORT AND RECOMMENDATION**

(1) Thurlee Belfrey,
(2) Roylee Belfrey,

          Defendants.

    Robert M. Lewis, Esq., Assistant United States Attorney, for the plaintiff,
        United States of America;
    Deborah K. Ellis, Esq., for defendant Thurlee Belfrey; and
    Kevin W. DeVore, Esq., for defendant Roylee Belfrey.

This action came on for hearing before the Court, Magistrate Judge Jeffrey J. Keyes, on May 19, 2015, at the U.S. Courthouse, 316 North Robert Street, St. Paul, MN 55101. The Court issued an Order on Motions dated May 19, 2015, reserving Defendants' motions to suppress statements and search and seizure evidence for submission to the District Court on Report and Recommendation. Testimony was presented and exhibits were received at the hearing with regard to suppression of evidence and statements.

Based upon the file and documents contained therein, along with testimony of witnesses and exhibits presented at the hearing, and the memoranda of counsel, this Court makes the following:

I.  **FINDINGS**

   A.  <u>**Search Warrants**</u>

On March 19, 2014, United States Magistrate Judge Janie S. Mayeron issued warrants authorizing searches at four particularly described locations, including residences in Edina, Minnesota (Hrg. Ex. 1) and St. Paul, Minnesota (Hrg. Ex. 2) and business offices in Brooklyn Park, Minnesota (Hrg. Ex. 3) and Minneapolis, Minnesota (Hrg. Ex. 4). The warrant affidavits identify the Edina, Minnesota location as the residence of Defendant Thurlee Belfrey and the St. Paul, Minnesota location as Roylee Belfrey's residence. The Brooklyn Park, Minnesota office is identified as Roylee Belfrey's office and the Minneapolis, Minnesota office was associated with Thurlee Belfrey. Substantially identical applications and affidavits were submitted in support of each warrant.[1] Each warrant stated that the items to be seized constituted instrumentalities, fruits, and evidence of particularly identified crimes, and such items were specifically

---

[1] The warrant affidavits vary only with respect to Attachment B specifications of items to be seized. The Attachment B listings on the residence warrants (Hrg. Ex. 1 and Ex. 2) appear to be the same. The Attachment B listings for the office warrants (Hrg. Ex. 3 and Ex. 4) are slightly different from one another and both of them add items or exclude some items that were listed in the Attachment B to the residence warrants. Defendant Thurlee Belfrey has asserted that Attachment B listings to the warrants to search his Edina residence (Hrg. Ex. 1) and his Minneapolis office (Hrg. Ex. 4) are over broad only with respect to the time frame of relevant documents that would be subject to seizure. These warrants are not challenged for lack of probable cause or on other grounds. Defendant Roylee Belfry generally challenges the warrants to search his St. Paul residence (Hrg. Ex. 2) and his Brooklyn Park Office (Hrg. Ex. 3), without specifying grounds for such challenges.

identified as records pertaining to the period of time between January 1, 2005 and the present.  Also, each of the residence warrant affidavits and search warrants described the objects of the particular warrant as accounting and bookkeeping records; banking and financial records and documents; address and telephone books; documents relating to the possession of assets; income and expense records; records relating to suppliers, subcontractors and employees; residency documents; lock box and safe deposit box keys; tax returns and associated schedules; financial statements; and computer and electronic data storage devices.  The Brooklyn Park office warrant is the same except Attachment B also lists invoices and records showing customer renumeration, and the Minneapolis office warrant Attachment B list excludes address books.  The warrants were issued on the basis of probable cause evidence asserted in the Affidavit of IRS Special Agent Valerie Ingram.

   The lengthy and detailed affidavits describe the affiant's experience in investigating financial and tax crimes and the nature of pertinent evidence in such an investigation.  The affidavits identify individuals, the defendants in this matter, as subjects of the investigation and suspected offenses.  The affidavits also list numerous business entities linked to the investigation subjects.  Defendant Thurlee Belfrey's conviction in a prior Medicaid fraud case and implications of that conviction are discussed.  The affidavit thereafter extensively recites particulars regarding Thurlee Belfrey's and Roylee Belfrey's suspected involvement in health

care fraud, business and personal income tax evasion, and employment tax return liability. The investigation included analysis of IRS records and bank account records, and the affidavit states reasons for the belief that evidence relating to suspected offenses would be found at each of the locations to be searched. The warrants were simultaneously executed on March 20, 2014, the day following their issuance. Evidence was seized pursuant to each of the warrants.[2]

### B. Interview Statements

Special Agents representing the FBI, IRS, and the U.S. Department of Human Services enforcement division simultaneously executed each of the above-referenced search warrants in a combined federal agency effort conducted on the morning of March 20, 2014. Approximately ten federal agents participated in each warrant execution, a typical number of agents for an enforcement action such as this. Many, but not all, of the various agents wore raid gear which included a jacket identifying the special agent's affiliation, a bulletproof vest, and a sidearm.

**Roylee Belfrey Interview.** IRS Special Agent James Shoup participated in the warrant execution and search of the offices in Brooklyn Park, Minnesota. The offices were on the second or third floor of a commercial building. The door

---

[2] An additional search warrant, based upon the same supporting affidavit, was also issued by Magistrate Judge Mayeron on March 19, 2014, and executed on March 20, 2014. That search warrant is not before the Court in this case.

to the office area was locked, but agents had been informed that Roylee Belfrey was en route to the location and they therefore waited in an outside lobby area for his arrival to let them into the suite. Agents waited for approximately 15 to 20 minutes, at which time Roylee Belfrey came to the front door from inside the office area to let the special agents into the suite. Roylee Belfrey had entered the office from another entrance without the knowledge of the waiting agents. The special agents did not have weapons drawn as they entered the offices, though some of them did a preliminary security sweep of the area.[3] Special Agent Shoup and FBI Special Agent Gene LaPlace had initial conversations with Roylee Belfrey, and Special Agent Shoup advised Mr. Belfrey that he was not under arrest and that he was free to leave. Shoup was wearing jeans and a shirt that covered the handgun and badge on his hip. He had taken off his raid jacket and bulletproof vest while waiting for someone to arrive at the office with a key. When Roylee Belfrey asked what the search warrant was about, Shoup asked whether he would be willing to answer some questions. Shoup also indicated that other agents who were not yet present would be arriving to conduct an interview. Mr. Belfrey was pleasant and cooperative with agents and waited in a conference room until the other agents arrived to interview him. He was not required to stay

---

[3] Defendant Roylee Belfrey asserts in his post-hearing memorandum that agents had guns drawn when he opened the door and while the protective sweep was conducted. There is no evidence before the court to support that claim and, indeed, the testimony was to the contrary. (Hrg. Tr. 17.)

in the conference room, and at one point he left the room to assist agents in gaining access to a computer.

Twenty to forty minutes passed before FBI Special Agent Ruth Hovey arrived to meet with Roylee Belfrey. Hovey had attended the contemporaneous warrant execution at Roylee Belfrey's St. Paul, Minnesota, residence, anticipating that he would be at his home, but she promptly went to the office upon receiving information that Roylee Belfrey had gone to the Brooklyn Park office. Hovey carried a Glock handgun and her badge on her hip, covered by a jacket. Hovey and IRS Special Agent Angie Johnson met with Roylee Belfrey in the conference room to conduct an interview. The conference room had a glass entry door to the lobby area and windows to the outside. The room contained a long table and a credenza. Hovey sat at the table facing the glass doorway, and Johnson sat with her back to the lobby area. Roylee Belfrey agreed to be interviewed and was cooperative and pleasant. He stated that he wanted to cooperate with agents and was advised that he could obtain an attorney or contact the Assistant United States Attorney handling the matter if he wished to do so. Belfrey appeared to understand the questions put to him, though he did not answer all questions and frequently asked questions himself. Belfrey also declined to consent to a search of his vehicle. He was not given the *Miranda* rights warnings, and in accordance with FBI practice, the interview was not recorded. Roylee Belfrey was given a target letter near the end of the interview but he was not arrested, and he left the

office without interference from agents as the search proceeded. The interview ran from approximately 9:00 a.m. until 12:45 p.m. Special Agent Hovey prepared a written report following the interview.

**Thurlee Belfrey Interview.** Federal agents arrived at Thurlee Belfrey's Edina, Minnesota residence at approximately 8:00 a.m on March 20, 2014, and engaged in surveillance of the home for an hour before commencing execution of the warrant to search. Special Agent David Kiesow of the U.S. Department of Health and Human Services, Office of the Inspector General, sought to interview Mr. Belfrey at his home while the search was being conducted but had received information that Thurlee Belfrey may have gone to a Lifetime Fitness location. Special Agent Kiesow went in search of Belfrey but went to the wrong Lifetime Fitness gym. Nonetheless, Thurlee Belfrey had been contacted about the warrant execution and returned to his home, arriving at about the same time that Special Agent Kiesow got back. Meanwhile, agents entered and performed a security clearance of the home. After Kiesow met Thurlee Belfrey and Belfrey agreed to an interview, the special agent went to his car and took off his raid jacket and bulletproof vest, though he kept his handgun at his hip.

At Thurlee Belfrey's suggestion, he and Special Agent Kiesow, along with IRS Special Agent Ken Frye, went to a home office to talk. Belfrey was advised that federal agents were investigating tax and health care matters, including fraud, abuse and waste. He was told that he did not have to answer questions

and that the interview could be terminated by him at any time. Belfrey was not given the *Miranda* advice of rights and was not advised that he could have an attorney present. There was no discussion regarding custody and the office door remained open. The interview lasted approximately two hours, and Belfrey was not subjected to intimidation or restrained at any time during the interview. Belfrey was generally cooperative, but was somewhat argumentative at times. The interview ended when Special Agent Kiesow left the office to take a phone call, and Thurlee Belfrey and Special Agent Frye likewise left the office. The interview was not recorded. Special Agent Kiesow left the location between 12:00 p.m. and 12:30 p.m. and later prepared a written report based on notes taken during the interview

## II. CONCLUSIONS

### A. Search Warrants

Evidence seized pursuant to separate warrants to search four particularly described locations in Edina, Minnesota (Hrg. Ex. 1), St. Paul, Minnesota (Hrg. Ex. 2), Brooklyn Park, Minnesota (Hrg. Ex. 3) and Minneapolis, Minnesota (Hrg. Ex. 4) was not unlawfully obtained in violation of the constitutional rights of Defendant Thurlee Bailey or Defendant Roylee Bailey. The search warrants were issued on March 19, 2014, and were based upon sufficient probable cause as stated in the Affidavits of IRS Special Agent Valerie Ingram and as determined by United States Magistrate Judge Janie S. Mayeron. The respective warrants

properly and sufficiently identified the location of the particular search and the items to be seized.

As to Defendant Thurlee Belfrey's claim that search warrants were defective for failing to specify a time frame for pertinent records, this Court concludes that the search warrants were not overly broad or lacking in particularity as to the items subject to seizure as the result of a failure to place a time limitation on the documents which could seized. The warrants expressly stated that the items to be seized were records pertaining to the period from January 1, 2005 to the present. Also, the items to be seized were limited to instrumentalities, fruits, and evidence of specifically identified crimes, thereby "prevent[ing] a general exploratory rummaging through a person's belongings" that would violate the particularity requirement of the Fourth Amendment. *Milliman v. Minnesota*, 774 F.2d 247, 249-50 (8th Cir. 1985) (citing *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)); see also *United States v. Stelton*, 867 F.2d 446, 450 (8th Cir. 1989). Each of the search warrants in this matter was lawfully issued and executed, and there is no requirement for suppression of evidence seized pursuant to the warrants.[4]

---

[4] In any event, this Court concludes that the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984), applies with respect to execution of the search warrants in this case. "[A]bsent allegations that the [issuing judge] was not neutral, 'suppression is appropriate only if the officers were dishonest or reckless in preparing the affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Formaro*, 152 F.3d 768, 771 n.4 (8th Cir. 1998) (quoting *Leon* 468 U.S. at 926). There is

B. **Statements**

**Roylee Belfrey.** Defendant Roylee Belfrey's statements to IRS Special Agent James Shoup and FBI Special Agent Gene LaPlace during the execution of a seach warrant at a Brooklyn Park office, as well as interview statements to FBI Special Agent Ruth Hovey and IRS Special Agent Angie Johnson, in a conference room in the office area, on March 20, 2014, were not made while defendant was under arrest or in a custodial setting. Defendant was not compelled to be present at the office during execution of the search warrant and he voluntarily went to the office to admit agents into the office area. He was advised by Special Agent Shoup that he was not under arrest and was free to leave. Although agents' weapons were visible, they were not drawn. Defendant waited in a conference room for interviewing agents to arrive and was able to come and go from the conference room at will. Defendant's statements were freely and voluntarily provided; the statements were not the result of promises, threats, or coercion; the statements were not otherwise obtained in violation of Roylee Belfry's constitutional rights, including the right to counsel and the right to remain silent; and Defendant was not arrested at the conclusion of the interview.

---

no claim in this matter that the issuing judge was not neutral, and there has been no request for a hearing or review under *Franks v. Delaware*, 438 U.S. 154 (1978), to consider whether the affidavit contains deliberate or reckless misrepresentations, either by omission or misstatement. *Formaro*, 152 F.3d. at 771.

In considering whether the defendant was in custody during questioning the court must assess the totality of the circumstances. *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002). Custody occurs when the subject's freedom of action is limited in any significant manner. *Id* at 500 (citing *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) and *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602 (1966)). The court must consider the presence and extent of physical and psychological restraints upon the subject's liberty during questioning and thereafter determine whether a reasonable person in the suspect's situation would have understood that he was indeed in custody. *Axsom* at 500 (citing *Griffin*, 922 F.2d at 1347). Indicia which are commonly applied in determining custody are:

> (1) whether the suspect was informed that the questioning was voluntary and that the subject was free to leave or request that officers leave, or that the suspect was not under arrest; (2) whether the suspect possessed unrestrained freedom during questioning; (3) whether the suspect initiated contact with law enforcement or voluntarily acquiesced to requests for responses to questions; (4) whether strong arm tactics or deception were used during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the subject was arrested at the conclusion of questioning.

*Id*., (citing *Griffin* at 1349). Here, defendant Roylee Belfry was advised that he was not under arrest and that he was free to leave at any time; the defendant voluntarily assented to the interview and any questioning; and the defendant's freedom actually was unrestricted and he was indeed free to leave at any time. The facts pertinent to the first three *Griffin* factors strongly mitigate against the

existence of custody in this matter.  Proceeding further with an analysis of factors which relate to the aggravating conduct of agents, there were no strong arm tactics used by the agents.   The atmosphere of the questioning was likely police dominated because it was occurring while a search warrant was being executed, but "there is nothing untoward about that circumstance." *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014) (citing *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011).  And the defendant was not arrested at the end of the meeting.  In essence, none of the aggravating factors weight in favor of a conclusion that Roylee Belfrey was in custody at any time on March 20, 2014.

Under the circumstances of the interview in this instance there was no requirement that the defendant be advised of his rights per *Miranda*, the meeting did not take place in a coercive setting, and defendant was not arrested and was free to leave at any time before, during, and after execution of the search warrant and the conference room interview.
Neither the pre-interview statements to Special Agents Shoup and LaPlace, nor the interview statements to Special Agents Hovey and Johnson, obtained from Roylee Belfrey in the course of the March 20, 2014 search warrant execution, should be suppressed.

**Thurlee Belfrey.**  Defendant Thurlee Belfrey's statements to Special Agent David Kiesow of the U.S. Department of Health and Human Services, Office of the Inspector General, and IRS Special Agent Ken Frye at the

Defendant's residence on March 20, 2014, were not made while Defendant was under arrest or in a custodial setting. The agents and Thurlee Belfrey were meeting pursuant to Agent Kiesow's request during a search warrant execution, and an interview proceeded pursuant to Defendant Belfrey's voluntary and willing consent. The interview took place in a home office at Defendant's suggestion and was not coerced in any respect. Defendant's statements were freely and voluntarily provided; the statements were not the result of promises, threats, or coercion; the statements were not otherwise obtained in violation of Thurlee Belfrey's constitutional rights, including the right to counsel and the right to remain silent; and Defendant was not arrested at the conclusion of the interview. Under the circumstances of the interview in this instance there was no requirement that the Defendant be advised of his rights per *Miranda*. He was free to leave the home office and the residence at all times before, during, and after the interview.

With respect to the *Griffin* factors previously discussed, Thurlee Belfrey was advised that the meeting was voluntary and that he was not under arrest; the Defendant's freedom during questioning was entirely unrestricted; and the Defendant voluntarily responded to questions. The mitigating factors weigh against a determination that Thurlee Belfrey was in custody. The aggravating factors likewise weigh against a finding of custody where there is simply no evidence of deception or strong arm tactics during questioning, no overwhelming

13

atmosphere of police domination in questioning, and no arrest after questioning. Statements obtained from defendant Thurlee Belfrey in the course of the March 20, 2014, interview should not be suppressed.

Based upon the foregoing Findings and Conclusions, this Court makes the following:

## RECOMMENDATION

The Court **hereby recommends** that:

1.  Defendant Thurlee Bailey's Motion for Suppression of Confessions or Statements in the Nature of Confessions be **DENIED** (Doc. No. 36) ;

2.  Defendant Thurlee Bailey's Motion to Suppress Evidence Obtained as a Result of Illegal Stops and Searches be **DENIED** (Doc. No. 37);

3.  Defendant Roylee Bailey's Motion for Suppression of Evidence Obtained by Search and Seizure be **DENIED** (Doc. No. 39); and

4.  Defendant Roylee Bailey's Motion for Suppression of Confessions or Statements in the Nature of Confessions be **DENIED** (Doc. No. 43).


Dated:   June 25, 2015

    s/*Jeffrey J. Keyes*
Jeffrey J. Keyes
United States Magistrate Judge

Under Local Rule 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by July 9, 2015, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.